IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
Heard at Knoxville
January 4, 2005 Session

## STATE OF TENNESSEE v. EDWIN GOMEZ and JONATHAN S. LONDONO

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2001-A-280    Cheryl Blackburn, Judge**

---

**No. M2002-01209-SC-R11-CD - Filed April 15, 2005**

---

We granted this appeal to determine whether the defendants are entitled to relief on their claim that admission of testimony about a co-defendant's oral statement violated their Sixth Amendment right to confrontation and whether the defendants' sentences were imposed in violation of their Sixth Amendment right to trial by jury. We conclude that admission of testimony about a co-defendant's oral statement violated the defendants' Sixth Amendment right to confrontation because the defendants had no prior opportunity to cross-examine the co-defendant. See Crawford v. Washington, __ U.S. __, 124 S. Ct. 1354 (2004). Nevertheless, we conclude that Gomez is not entitled to relief on this claim because he has failed to preserve it for review and has failed to establish the prerequisites for obtaining relief via plain error review. Although Londono preserved the issue for plenary appellate review, we conclude that he is not entitled to relief because the constitutional error is harmless beyond a reasonable doubt. Finally, we conclude that the defendants' sentences were not imposed in violation of their Sixth Amendment right to jury trial. See United States v. Booker, __ U.S. __, 125 S. Ct. 738 (2005); Blakely v. Washington, __ U.S. __, 124 S. Ct. 2531 (2004). Thus, the defendants are not entitled to relief on this claim. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Affirmed**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined. E. RILEY ANDERSON, J., filed a concurring and dissenting opinion, in which ADOLPHO A. BIRCH, JR., J., joined.

Glenn R. Funk and Cynthia M. Fort, Nashville, Tennessee, attorneys for Appellant, Edwin Gomez.

David A. Collins, Nashville, Tennessee, and James Stafford, Houston, Texas, Attorneys for Appellant, Jonathan S. Londono.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Gordon W. Smith, Associate Solicitor General; Victor S. (Torry) Johnson III, District Attorney General; and Bret Gunn and Roger Moore, Assistant District Attorneys General, for the Appellee, State of Tennessee.

David L. Raybin, Nashville, Tennessee and Wade V. Davies, Knoxville, Tennessee, for Amicus Curiae, The Tennessee Association of Criminal Defense Lawyers.


## OPINION

### I. Factual Background

On March 16, 1999, Carlyle & Company Jewelers, ("Carlyle & Company"), a retail store located in the Green Hills Mall of Nashville, put on a special one-day "trunk" showing of approximately 100 Rolex watches with an estimated value of $750,000. The sales event had been advertised throughout the Nashville area. The next day, March 17, 1999, security guards Roy Rogers ("Rogers") and Eugene Nagele ("Nagele") arrived at the store shortly before 9:00 a.m to retrieve and transport the watches to another store in the Nashville area for a similar event. For transport, the watches were stored in metal boxes, which were then stacked onto a luggage cart. Shortly after 9:00 a.m., Rogers and Nagele pushed the luggage cart from the store into the adjoining Green Hills Mall parking garage, where they had parked. Before they arrived at their vehicle, assailants attacked Rogers and Nagele from behind and stole the watches.[1] Nagele testified that he heard the sound of footsteps "rushing" toward him, but before he could turn toward the assailants, he sustained a blow to the back of his head. Before losing consciousness, Nagele heard a gunshot. When he regained consciousness, Nagele heard someone calling for him. Realizing that Rogers had been shot, Nagele rushed to assist him. Twenty-one days later, Rogers died as a result of complications from a single gunshot wound. Although Nagele was unable to identify any of the assailants, he recalled hearing them speaking a language other than English.

Deborah Sloan ("Sloan") testified that she arrived with her two young children at Green Hills Mall between 9:10 and 9:15 a.m. on March 17, 1999. After parking in the garage adjoining the mall, but before exiting her minivan, Sloan "heard a bang, a loud bang, and a lot of running and rustling and things like that." Turning toward this noise, Sloan saw one man lying on the ground, a second man "on his hands and knees fac[ing] away from [her]," and three other men "just running around[.]" Two of these men carried away the metal boxes containing the watches, and the third man "lean[ed] over beside the man who was lying on the ground and pick[ed] up a gun." The three men then departed in a "very nice" "deep red" or "purplish-maroon" Chrysler minivan. Sloan described the three men as young, in their "twenties," with "dark skin, dark hair," and "fairly-average height and weight." When shown photographic arrays prior to trial, Sloan identified Edwin Gomez ("Gomez")

---

[1]The assailants also stole Nagele's Colt pistol valued at $1,500.

and Jonathan S. Londono[2] ("Londono") (collectively "the defendants") as two of the men she had seen take the boxes and gun and depart in the minivan on March 17, 1999. She again identified Gomez and Londono at trial.

Christina Hudson ("Hudson"), a Carlyle & Company employee, testified that she had arrived and parked in the Green Hills Mall parking garage shortly before 9:00 a.m. on the day of the robbery and shooting. While waiting in her car for a co-worker to arrive, Hudson noticed a dark-skinned male, whom she described as either Hispanic or African-American, enter the passenger side of a purplish-colored minivan. When the man opened the van door, Hudson saw three other men slouched down in the back of the vehicle. Hudson was unable to identify any of the men in the van.

Barbara Franklin ("Franklin"), also an employee of Carlyle & Company, testified that two Hispanic men had come into the store on the afternoon before the robbery. Franklin recalled that the shorter of the two men had asked many questions about the watches and about which merchandise would remain in the store after the one-day event. This man had "spoke[n] English very haltingly" as if "English [were] not his first language," and the taller man had not spoken at all.[3]

After hearing news reports about the crime, Michelle Nicholson ("Nicholson") contacted the police and told them that she had noticed a maroon van with Florida license plates traveling toward Nashville on Interstate 40 shortly after 8:00 a.m. on March 17, 1999. Nicholson observed the van "weaving in and out of traffic" and saw four men seated in the vehicle, all of whom she described as Hispanic with "dark hair." Nicholson recalled that the van later exited Interstate 440 onto Hillsboro Road going toward Green Hills Mall.

Based on Nicholson's tip and information which witnesses had provided at the scene, investigators canvassed hotels and motels along the interstate highways, westbound to the Davidson County line, seeking information concerning Hispanic men traveling in a maroon van. On March 18, 1999, investigators discovered that four Hispanic men, driving a white van and a maroon van, had rented two rooms at the Howard Johnson's Motel at Interstate 40 and Charlotte Pike. Security videotapes from the motel showed two men at the front desk, a maroon van and a white van in the motel parking lot, and persons coming and going from the vans. Although the tapes were not sufficiently clear to identify these persons, the front desk clerk at the motel identified Londono[4] from photographic arrays.

---

[2] She also identified co-defendant Bryant Guartos ("Guartos"), who was tried separately and convicted of conspiracy to commit aggravated robbery, felony murder of Rogers, especially aggravated robbery of Rogers, and aggravated robbery of Nagele.

[3] Franklin later identified co-defendant Guartos as the shorter man, but she failed to identify the taller man who had accompanied Guartos.

[4] The clerk also identified Guartos but was unable to identify Gomez.

Investigators obtained additional evidence from the motel rooms. Inside the closet of Room 204, investigators found ammunition consistent with the bullet that struck the victim. Investigators recovered from inside this ammunition box a fingerprint, which later was matched to Londono's right middle finger. Investigators found another fingerprint on the telephone extension in Room 204, which later was matched to Gomez's right middle finger.[5] Housekeepers also discovered in Room 204 a seat that had been removed from a 1996 or 1997 Chrysler minivan, and this seat was turned over to police investigators.

Telephone records revealed that a call had been made on March 14, 1999, from the motel to a pay telephone located outside a restaurant "[a]bout a block-and-a-half" down the street from the Green Hills Mall. Another call had been made on March 16, 1999, at 7:10 a.m. from the motel to a pay telephone located inside the mall, directly across from and facing Carlyle & Company. On March 15 and 16, 1999, a calling card had been used to place telephone calls from the motel room and from a Nashville restaurant to two different numbers in Bogota, Columbia. The same calling card was used on the afternoon of March 17, 1999, to place a call from Montgomery, Alabama, to Miami, Florida and was used again on the morning of March 18, 1999, to place a call to Bogota, Colombia from Gomez's home telephone number in Miami, Florida.

Julie Jimenez ("Jimenez"), who had lived with Londono in Miami in the spring of 1999, testified that Londono and Gomez lived in the same apartment complex and that Gomez visited Londono's apartment daily. Londono told Jimenez that he and Gomez were cousins. Before leaving town for "[s]even or ten days" in the spring of 1999, Londono told Jimenez that he was going somewhere to make some money, but he refused to tell her where he was going. Jimenez recalled that Londono left Miami with Gomez, Bryant Guartos ("Guartos"), Guartos' wife Maria Sierra, and three other Hispanic men whose names Jimenez did not know. The group left Miami in two vehicles, a white van and a maroon van. Shortly before he returned to Miami, Londono telephoned Jimenez, telling her that he had been to Tennessee, that he had Rolex watches, and that he planned to give her a Rolex watch. Jimenez heard Gomez's voice in the background during this conversation.

When Londono returned to Miami, he gave Jimenez some Nashville postcards and a report of the trip. Londono told Jimenez the group had stolen Rolex watches from a jewelry store in a shopping mall in Tennessee. Londono said the group had drawn their guns and instructed everyone to lie on the floor. When a security guard lying on the floor reached for his gun, Londono kicked the man and grabbed his gun. According to Londono, someone else shot the security guard because the security guard had seen Londono's face.

Jimenez recalled that Londono received his share of the money from the sale of the watches a few days after returning to Miami. On April 4, 1999, Jimenez and Londono used the money for a shopping spree, spending approximately $3,000 cash on furniture, a television, and other items for

---

[5]Investigators also discovered Guartos's fingerprint on the telephone inside this room.

Londono's apartment. Concerned that someone would be looking for him, Londono insisted that Jimenez purchase everything in her name.

On April 25, 1999, Detective Gerard Starkey of the Miami-Dade Police Department arrested Londono on unrelated charges. Detective Starkey searched Londono's burgundy van and found a postcard of the Nashville riverfront area. Thereafter, Detective Starkey located Gomez at his apartment in the Fontainebleau Milton complex and arrested him on unrelated charges. Detectives found $19,600 in cash concealed between the kitchen counter and the dishwasher in Gomez's apartment. Detectives also discovered a furniture receipt for $570, dated March 25, 1999, and three money transfer receipts, evidencing money transfers totaling $6,000 from Gomez and his roommate to persons in Bogota, Columbia. The telephone numbers of the persons to whom the money had been sent matched the telephone numbers to which calls had been placed from the motel and restaurant in Nashville. Two of the money transfers occurred on March 23, 1999. The date on the third receipt was indiscernible.

Detectives from Nashville questioned Londono and Gomez in Miami about their involvement in the March 17, 1999, robbery and shooting at Green Hills Mall. Both men denied ever being in Nashville. These detectives also interviewed Guartos in Miami, and he confessed to his involvement in the crime, providing an oral statement. Guartos later denied making this statement. However, at the Gomez-Londono trial, the detectives were allowed to testify about what Guartos said to them about the crime. Detective Harold Haney testified as follows:

> [Guartos] stated that he and others were in Nashville. They used two rented vans which they got from someone in Miami. One was a wine colored or red. [sic] The other was white. They stayed at the Howard Johnson Motel and used two rooms. He and a woman took the seat out of the white van at the motel because they needed more room. He stated that they got two-hundred-thirty-thousand dollars ($230,000.00) for the watches from the robbery and he used his share of forty-thousand dollars ($40,000.00) to buy his home in Miami.[6]

Gomez and Londono were indicted and tried on the following charges: Count I, conspiracy to commit aggravated robbery; Count II, felony murder of Rogers; Count III, especially aggravated robbery of Rogers; and Count IV, aggravated robbery of Nagele. The jury convicted the defendants of conspiracy, as charged in Count I. As to each of the remaining charges, the jury found the defendants guilty of the following lesser-included offenses: facilitation of felony murder, facilitation of especially aggravated robbery, and facilitation of aggravated robbery. The defendants each

---

[6] Detective Norris Tarkington summarized Guartos' statement as follows:

[Guartos] stated that he and the others were in Nashville. They stayed at the Howard Johnson's and they. . . came to Nashville in two rented vans. One was a wine color or red color and the other one was white, and they took the seat out of one of the vans because they needed more room, and he stated they sold the watches for two-hundred-thirty-thousand dollars ($230,000.00) in Miami, and his proceeds from that, his take of that was forty-thousand dollars ($40,000.00).

received the maximum sentence within the range for each conviction: six years for conspiracy, twenty-five years for facilitation of felony murder, twelve years for facilitation of especially aggravated robbery, and six years for facilitation of aggravated robbery. The trial judge ordered consecutive service of the sentences for an effective forty-nine year sentence.

Gomez and Londono appealed, and the Court of Criminal Appeals affirmed the judgment of the trial court. Thereafter, this Court granted the defendants' applications for permission to appeal.

## II. Admission of Guartos' Statement

### A. Crawford v. Washington

As noted previously, Guartos, who had been separately tried and convicted before the Gomez-Londono trial, provided an oral statement to the police regarding the crime. Because Guartos invoked his Fifth Amendment privilege against self-incrimination at the Gomez-Londono trial, the prosecution sought to admit testimony as to his statement under the hearsay exception for statements against penal interest. See Tenn. R. Evid. 804(b)(3)[7]. Londono objected, arguing that admitting the statement would violate his Sixth Amendment right to confront Guartos. Gomez also initially objected to the statement's admission, but he withdrew the objection after the prosecution agreed not to seek admission of a certain part of the oral statement. After confirming that Gomez had withdrawn his objection, the trial court carefully considered Londono's objection. Ultimately, the trial court allowed the detectives to testify about interviewing Guartos and to testify about his oral statement, but the detectives did not testify about the portion to which Gomez had objected. Detective Haney testified as follows:

> [Guartos] stated that he and others were in Nashville. They used two rented vans which they got from someone in Miami. One was a wine colored or red. [sic] The other was white. They stayed at the Howard Johnson Motel and used two rooms. He and a woman took the seat out of the white van at the motel because they needed more room. He stated that they got two-hundred-thirty-thousand dollars

---

[7]Rule 804(b)(3) provides, in pertinent part:

> (b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Rule 804(a) delineates the situations in which a declarant is "unavailable as a witness." The defendants have never contended that the trial court erred by finding Guartos unavailable as a witness for purposes of Rule 804(b)(3).

($230,000.00) for the watches from the robbery and he used his share of forty-thousand dollars ($40,000.00) to buy his home in Miami.

Immediately after each detective testified, the trial court provided a cautionary instruction, which limited jury consideration of Guartos' statement to the issue of whether the conspiracy charged in Count I existed. The cautionary instruction expressly forbade jury consideration of Guartos' statement as to Gomez's and Londono's participation in the conspiracy.

Both in his motion for new trial and on appeal to the Court of Criminal Appeals, Londono challenged the trial court's ruling as violative of his Sixth Amendment right to confront the witnesses against him. The intermediate appellate court applied Ohio v. Roberts, 448 U.S. 56 (1980), *abrogated by* Crawford v. Washington, 541 U.S. 36 (2004), the then-controlling precedent for analyzing challenges based on the Confrontation Clause. In Roberts, the United States Supreme Court held that out-of-court statements made by a nontestifying declarant are constitutionally admissible against an accused at trial only if the prosecution demonstrates that the declarant is unavailable and establishes either that the statements fall within a firmly- rooted hearsay exception or that the statements possess "particularized guarantees of trustworthiness." Id. at 66. Applying this test, the Court of Criminal Appeals concluded that the trial court had properly admitted testimony summarizing Guartos' oral statement. Although it did not fall within a firmly-rooted exception to the hearsay rule, the Court of Criminal Appeals concluded that the testimony "was nonetheless supported by sufficient guarantees of trustworthiness" to justify its admission. In an opinion filed February 18, 2004, the Court of Criminal Appeals thus rejected Londono's Sixth Amendment claim.

Less than one month later, however, the United States Supreme Court rendered its decision in Crawford v. Washington,124 S. Ct. 1354 (2004), which abrogated the two-prong test of Roberts. The Court in Crawford held that "testimonial" out-of-court statements by a nontestifying declarant may be admitted only if the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. Crawford, 124 S. Ct. at 1374. The Crawford Court declared cross-examination to be the "constitutionally prescribed method of assessing reliability" of testimonial statements in criminal trials. Id. at 1370. Upon surveying the historical record, the Court derived "two inferences about the meaning of the Sixth Amendment." Id. at 1363. "First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." Id. Second, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 1365. The Court concluded by reiterating its holding:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required:

-7-

unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

Id. at 1374 (footnote omitted). The Court used "the term 'interrogation' in its colloquial, rather than any technical legal [] sense" and explained that a "recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." Id. at 1365 n.4.

Relying upon Crawford, both Londono and Gomez now argue that the introduction of Guartos' statement violated their Sixth Amendment right of confrontation. The State acknowledges that, had Crawford been decided prior to the Gomez-Londono trial, Guartos' statement would have been inadmissible; nonetheless, the State asserts that the defendants are not now entitled to relief on this basis. In particular, the State argues that Gomez either affirmatively waived or procedurally forfeited plenary appellate review of this issue. As to Londono, the State asserts that any error was harmless beyond a reasonable doubt.

We begin by accepting the State's concession that Crawford would have precluded admission of Guartos' statement had Crawford governed the trial court's analysis of this issue. The statement, a product of police interrogation, qualifies as "testimonial" evidence, and the defendants had no prior opportunity to cross-examine Guartos. Thus, were Gomez and Londono tried today, Crawford would bar admission of Guartos' statement. What is not clear, however, is whether Crawford entitles Gomez or Londono to relief in this appeal.

### B. Griffith v. Kentucky

The answer to this question begins with Griffith v. Kentucky, 479 U.S. 314 (1987). In Griffith, the United States Supreme Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . pending on direct review or not yet final . . . ." Griffith, 479 U.S. at 328. By abrogating the two-prong test of Roberts and reshaping the analysis courts must apply when evaluating the admissibility of evidence under the Confrontation Clause, Crawford announced a new rule within the meaning of Griffith. See Graham v. Collins, 506 U.S. 461, 467 (1993) ("[T]here can be no dispute that a decision announces a new rule if it expressly overrules a prior decision . . . ."); see also State v. Dedman, 102 P.3d 628, 636 (N. M. 2004) (recognizing that Crawford announced a new rule); Commonwealth v. Gray, 867 A.2d 560, 574 (Pa. Super. 2005) (recognizing that Crawford announced a new rule insofar as it overruled Ohio v. Roberts). Furthermore, this appeal qualifies as a case "pending on direct review" at the time Crawford announced the new rule. At first glance, then, Griffith would seem to require us to apply the Crawford rule in this appeal, without regard to whether the issue has been preserved for review. Closer analysis reveals, however, that Griffith mandates plenary retroactive application of new rules

to cases pending on direct review only if a defendant has timely raised and properly preserved the issue to which the new rule relates.

In mid-1985 the defendants in Griffith petitioned the Supreme Court for certiorari while their convictions were still pending on direct review. Griffith, 479 U.S. at 318. On April 30, 1986, while the Griffith petition was pending, the United States Supreme Court decided Batson v. Kentucky, 476 U.S. 79 (1986). Griffith, 479 U.S. at 318. In Batson, the Court rejected a portion of the reasoning of Swain v. Alabama, 380 U.S. 202 (1965). In particular, the Court rejected Swain to the extent that it had defined a prima facie case in the context of discriminatory selection of the jury venire as requiring proof that the prosecution had in a series of cases repeatedly exercised peremptory challenges to strike black jurors. Batson, 476 U.S. at 96-100. Abrogating this requirement, the Batson Court concluded that to establish a prima facie case a defendant need only show that the prosecution had used peremptory challenges to strike members of the defendant's race from the venire in the defendant's case. Id. at 93, 96-97.

On June 2, 1986, the Supreme Court granted certiorari in Griffith on the limited issue of whether Batson could be applied retroactively to cases on direct appeal. Griffith, 479 U.S. at 320. In United States v. Johnson, 457 U.S. 537 (1982), *partially abrogated by* Griffith v. Kentucky, 479 U.S. 314 (1987), the Court had held that a new rule of criminal procedure constituting a "clear break" with past precedent was not to be applied retroactively to cases pending on direct review. Because Batson had been a clear break with Swain,[8] its retroactive application to direct review cases was foreclosed by Johnson. Griffith, 479 U.S. at 326.

Notably, each of the Griffith defendants had objected prior to Batson in the trial court to the prosecutor's racially discriminatory exercise of peremptory challenges. Furthermore, the Griffith defendants had preserved their objections at each stage of their direct appeals, even though they clearly had failed to satisfy Swain's prima facie showing requirement. Griffith, 479 U.S. at 316-20 (discussing procedural history of the two cases under review). Not surprisingly, the Griffith defendants lost at every stage because every court applied Swain and held the defense proof of discrimination inadequate. Griffith, 479 U.S. at 316-22. Nonetheless, the Griffith defendants continued to press and to preserve their claims that the prosecutor had exercised peremptory challenges in a racially discriminatory manner.

Perseverance paid off for the Griffith defendants when the United States Supreme Court granted their certiorari petitions, discarded Johnson's "clear break" rule, and applied Batson retroactively to their appeal. Griffith, 479 U.S. at 326-28. Citing fairness considerations for defendants "similarly situated" to Batson, the Supreme Court reversed the Griffith defendants' convictions. Like the defendant in Batson, the Griffith defendants had properly presented and tenaciously preserved their constitutional challenge at trial and on appeal. Importantly, the Griffith defendants had raised and preserved this issue before the Supreme Court decided Batson, and had done so in the face of controlling precedent unfavorable to their position.

---

[8]See Allen v. Hardy, 478 U.S. 255 (1986).

Having thus reviewed its factual and procedural background, we conclude that <u>Griffith</u> does not mandate plenary retroactive application of new rules to pending direct review cases without regard to whether the claim of error has been properly preserved. Instead, <u>Griffith</u> simply overruled precedent which had precluded retroactive application of new rules to pending direct review cases.[9] Where, as here, a new rule is announced while a criminal case is pending on direct review, <u>Griffith</u> mandates plenary application of the new rule only if the issue to which the new rule relates has been timely raised and properly preserved. A criminal defendant who has failed to properly preserve the relevant issue is limited to seeking relief via plain error review.

---

[9]Our reading of <u>Griffith</u> is supported by a more recent case which recognizes the important distinction between issues that have been preserved and issues which have not been preserved. The issue in <u>United States v. Cotton</u>, 535 U.S. 625, 627 (2002), was "whether the omission from a federal indictment of a fact that enhances the statutory maximum sentence justifies a court of appeals' vacating the enhanced sentence, even though the defendant did not object in the trial court." Relying on <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), Cotton argued that his sentence should be vacated because the enhancing fact had been neither alleged in the indictment nor submitted to the jury. <u>Cotton</u>, 535 U.S. at 629-30. Reviewing his claim for plain error, the Court affirmed Cotton's sentence, explaining that "[t]he real threat . . . to the 'fairness, integrity, and public reputation of judicial proceedings' would be if [Cotton], despite the overwhelming and uncontroverted evidence that [he had been] involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial." <u>Id.</u> at 634 (citing <u>Johnson</u>, 520 U.S. at 470).

While not controlling the proper application of new federal constitutional rules, we note that this Court has regularly limited retroactive application of new rules to only those cases pending on direct review in which the issue has been timely raised and properly preserved. <u>See, e.g.</u>, <u>Hill v. City of Germantown</u>, 31 S.W.3d 234 (Tenn. 2000); <u>Alcazar v. Hayes</u>, 982 S.W.2d 845 (Tenn. 1998); <u>City of White House v. Whitley</u>, 979 S.W.2d 262 (Tenn. 1998); <u>McClung v. Delta Square Ltd. P'ship</u>, 937 S.W.2d 891 (Tenn. 1996); <u>Perez v. McConkey</u>, 872 S.W.2d 897 (Tenn. 1994); <u>Broadwell ex rel. Broadwell v. Holmes</u>, 871 S.W.2d 471 (Tenn. 1994); <u>Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.</u>, 846 S.W.2d 810 (Tenn. 1993); <u>McIntyre v. Balentine</u>, 833 S.W.2d 52 (Tenn. 1992); <u>Hataway v. McKinley</u>, 830 S.W.2d 53 (Tenn. 1992). <u>Adams v. State</u>, 547 S.W.2d 553 (Tenn. 1977); <u>Farris v. State</u>, 535 S.W.2d 608 (Tenn. 1976).

Despite the dissent's assertions to the contrary, <u>Farris</u> and <u>Adams</u> are excellent illustrations of this regular practice. <u>Farris</u> involved several defendants, but, in the trial court, Mr. Farris had challenged only the first paragraph of a statute which, in other sections, required jury instructions on parole eligibility. Although this Court ultimately invalidated that portion of the statute which required jury instructions on parole eligibility, the statutory provision Mr. Farris had challenged remained valid after this Court's decision. After this Court denied Mr. Farris relief, he filed a petition to rehear, arguing that he had timely raised and properly preserved his constitutional challenge. This Court denied rehearing, explaining, "[t]his Court operates on the basis of errors assigned for our consideration and we have neither the disposition nor the duty to search the record and decide cases and controversies on the basis of unassigned error." 535 S.W.2d at 622. In <u>Adams</u>, 547 S.W.2d at 556, the defendant challenged the constitutionality of the relevant statutory provision, but he did not base his challenge upon the constitutional ground that had garnered a majority in <u>Farris</u>. Instead, Mr. Adams argued that the statute was unconstitutionally vague, a constitutional challenge which in <u>Farris</u> Chief Justice Fones and Justice Henry found to have merit. This Court held that by challenging the constitutionality of the relevant statute, <u>Adams</u> had sufficiently preserved the issue, even though he had not raised the precise ground upon which the majority in <u>Farris</u> rested its decision. In so holding, the Court applied <u>Farris</u> "to those cases wherein the conviction has not become final and where appropriate assignments have been made." <u>Id.</u> Like Mr. Adams, Londono is entitled to full plenary review of his Confrontation Clause claim because he timely raised and properly preserved his constitutional challenge to the admission of Guartos' statement. On the other hand, Gomez failed to mount a constitutional challenge to the admission of Guartos' statement; thus, he is only entitled to plain error review on this issue.

Furthermore, even those criminal defendants who properly preserve such issues are not automatically entitled to relief. After the United States Supreme Court concluded in Shea v. Louisiana, 470 U.S. 51, 59 (1985), that the new rule which it had announced in Edwards v. Arizona, 451 U.S. 477 (1981), applied to cases pending on direct review, the Court explained that retroactive application of the new rule was "subject, of course, to established principles of waiver, harmless error, and the like." Shea, 470 U.S. at 58 n.4. Thus, a defendant may be entitled to plenary appellate review but not be entitled to relief on his claim.

### C. Plain Error Review - Gomez

Gomez initially objected to the statement's introduction, but his objection was not based on the Sixth Amendment. Guartos told the police that the group had "used two rented vans which they got from someone in Miami for twenty-five-hundred dollars ($2,500.00)," and Gomez objected to allowing the detectives to testify about the amount paid for the rented van, in particular, the words "for twenty-five-hundred dollars ($2,500.00)." The prosecution agreed not to introduce testimony about this portion of the oral statement. In responding to questions from the trial court, Gomez confirmed that his objection had been limited as described above and also confirmed that his objection was withdrawn in light of the prosecution's willingness not to introduce that testimony. Gomez did not challenge the statement's admission in his motion for new trial or in his appeal to the Court of Criminal Appeals. Having failed to preserve the issue in the courts below, Gomez is limited in this Court to seeking relief via plain error review.

Rule 52(b) of the Tennessee Rules of Criminal Procedure provides that "[a]n error which has affected *the substantial rights of an accused* may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." (emphasis added); see also Tenn. R. App. P. 36 (b) ("A final judgment . . . shall not be set aside unless, considering the whole record, *error involving a substantial right* more probably than not affected the judgment or would result in prejudice to the judicial process.") (emphasis added). Plain error review extends only to a clear, conspicuous, or obvious error which affects the substantial rights of the defendant. United States v. Olano, 507 U.S. 725, 732 (1993) (analyzing the substantially similar Federal Rule of Criminal Procedure 52(b)). Whether an error is "plain" or "obvious" is determined by reference to the law existing as of the time of appellate consideration. United States v. Johnson, 520 U.S. 461, 468 (1997). Moreover, relief is warranted only if the plain error prejudiced the defendant by affecting the outcome of the trial court proceedings. Id. at 732-37; State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005). Although very similar to harmless error analysis, plain error review places on the defendant the burden of persuasion, whereas the State bears the burden of persuasion when an appellate court conducts a harmless error analysis. Olano, 507 U.S. at 732-37.

The substantive standards for plain error review are difficult to satisfy. An appellate court will reverse for plain error only if:

(a) the record . . . clearly establish[es] what occurred in the trial court;

-11-

(b) a clear and unequivocal rule of law [has] been breached;
(c) a substantial right of the accused [has] been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established, and an appellate court need not consider all five factors if any one factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

Consideration of factor (d) indicates that Gomez is not entitled to relief. The record clearly establishes what occurred in the trial court: Gomez withdrew his objection to Guartos' statement, and he did so for tactical reasons.[10] Here, Gomez did not simply fail to object. Instead Gomez objected to testimony indicating that the group had rented the vans for $2,500 from a person in Miami. Gomez withdrew his objection when the prosecution agreed not to elicit such testimony. The information about the price paid for the rental van did not directly implicate Gomez. Nevertheless, this information, considered in conjunction with the receipt police found in Gomez's apartment for a $2,500 money transfer from Gomez's roommate in Miami to an individual in Bogota, Columbia, reveals the tactical nature of Gomez's objection and his willingness to withdraw it. Having failed to satisfy *at least* one of the plain error review factors, Gomez is not entitled to relief on this claim.

### D. Harmless Error Analysis or Structural Error - Londono

As previously noted, Londono has consistently argued that the admission of testimony about Guartos' statement violated his Sixth Amendment right to confront the witnesses against him. He has preserved the issue to which Crawford's new rule relates and is entitled to plenary appellate review of this issue. The State concedes, and we agree, that admitting testimony summarizing Guartos' "testimonial" statement violated the rule announced in Crawford because Londono had no prior opportunity to cross-examine Guartos. Having found that Londono's constitutional right to confront Guartos was violated, the next question is whether his conviction must be reversed because of this error.

---

[10] As the State points out, the United States Supreme Court has drawn a distinction between "forfeiture" and "waiver."

> Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." Whether a particular right is waivable . . . [and] whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.

Olano, 507 U.S. at 733 (citations omitted). Although it is debatable whether Gomez's action constitutes waiver or merely forfeiture, we need not discuss this distinction here. Assuming that the plain error standard applies, Gomez is nonetheless ineligible for relief for the reasons herein explained.

To answer this question, we must first determine whether <u>Crawford</u> errors are structural errors that defy harmless error analysis or are instead trial errors that are subject to harmless error analysis. The historical development of the harmless error doctrine and its general application to constitutional errors has been thoroughly documented by this Court. <u>See, e.g.</u>, <u>Momon v. State</u>, 18 S.W.3d 152 (Tenn. 1999); <u>State v. Williams</u>, 977 S.W.2d 101, 104 (Tenn. 1998). Significant to this case is the established principle that only a very limited class of "structural defects" require automatic reversal. <u>Momon</u>, 18 S.W.3d at 165-66. Such errors deprive defendants of basic protections and compromise the integrity of the trial process itself. <u>Id.</u> at 165; <u>see also</u> <u>Johnson</u>, 520 U.S. at 468-69 (citing examples of cases involving structural error, including <u>Sullivan v. Louisiana</u>, 508 U.S. 275 (1993) (defective reasonable-doubt instruction); <u>Waller v. Georgia</u>, 467 U.S. 39 (1984) (denial of public trial); <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986) (racial discrimination in selection of grand jury); <u>McKaskle v. Wiggins</u>, 465 U.S. 168 (1984) (denial of self-representation at trial); <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963) (complete denial of the assistance of counsel); <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927) (biased trial judge)).

The United States Supreme Court and this Court have held that violations of the Confrontation Clause are subject to harmless error review. <u>See, e.g.</u>, <u>Coy v. Iowa</u>, 487 U.S. 1012, 1021 (1988) (holding that denial of face-to-face confrontation is subject to harmless error analysis); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986) ("[W]e hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis."); <u>State v. Sayles</u>, 49 S.W.3d 275, 280-81 (Tenn. 2001); <u>State v. Howell</u>, 868 S.W.2d 238, 253 (Tenn. 1993). <u>Crawford</u> does not suggest otherwise. Those justices—including Justice Scalia, the author of the <u>Crawford</u> opinion— who disagreed with the Court's pre-<u>Crawford</u> conclusion in <u>Lilly v. Virginia</u>, 527 U.S. 116 (1999), that the admission of an accomplice's confession did not violate the Confrontation Clause, nonetheless concurred in the judgment because they believed that harmless error review applied to the perceived violation. <u>See</u> <u>Lilly</u>, 527 U. S. at 143 (Scalia, J., concurring in part and concurring in the judgment) (stating that admission of accomplice's statement against defendant violated Confrontation Clause, but that case should be remanded for harmless-error review); <u>id.</u> at 148 (Rehnquist, C.J., concurring in the judgment, joined by O'Connor and Kennedy, JJ.), <u>see also</u> <u>id.</u> at 143 (Thomas, J., concurring in part and concurring in the judgment) (joining plurality in remanding for harmless error review). Although <u>Crawford</u> preserves a criminal defendant's constitutional right to confront adverse witnesses, evidence admitted in violation of <u>Crawford</u> is an error in the trial process and not a defect affecting the framework within which the trial proceeds. <u>Johnson</u>, 520 U.S. at 468. Thus, like other Confrontation Clause violations, we conclude that a <u>Crawford</u> error is subject to harmless error analysis and does not constitute structural error requiring automatic reversal.

Furthermore, we conclude that the <u>Crawford</u> error in this case is harmless beyond a reasonable doubt. Guartos' statement did not directly implicate Londono or Gomez. Immediately after each detective testified about the statement, the trial court provided a cautionary instruction to the jury, limiting the jury's consideration of the testimony about the statement to the issue of whether the conspiracy existed and forbidding its consideration as to whether a particular defendant joined in the charged conspiracy. Jurors are presumed to follow the instructions of the trial court. <u>State v.</u>

Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). Moreover, the other properly-admitted evidence of guilt was substantial. An eyewitness, Sloan, identified Londono from a photographic array and again at trial, testifying that she was "very sure" of the identification. Fingerprint evidence placed Londono at the motel room where various other incriminating items were found linking Londono to the crime. Londono's girlfriend, Jimenez, with whom he had lived in Miami at the time of the crime, testified extensively about Londono's involvement in the crime and about how they spent Londono's share of the money from the crime. Accordingly, in light of the vague nature of the statement, the trial court's limiting instruction, and the other substantial evidence of guilt, we conclude that the error in admitting testimony about Guartos' statement was harmless beyond a reasonable doubt.

### III. Sentencing Issues

Gomez and Londono have asserted in this Court that their sentences were imposed in a manner that violated their Sixth Amendment right to a trial by jury.[11] In particular, the defendants complain that enhancement factors found by a judge by a preponderance of the evidence were used to impose maximum sentences for each of their convictions. Relying upon the United States Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531 (2004), the defendants assert that they were constitutionally entitled to receive the presumptive minimum sentence as defined in Tennessee Code Annotated section 40-35-210(c) (2003).

### A. Plenary Versus Plain Error Review

The defendants did not raise this constitutional challenge at their April 4, 2002, sentencing hearing or in their motions for new trial, nor did they raise it in the Court of Criminal Appeals. The defendants first raised this constitutional challenge in this Court.[12] The State initially argues that, by failing to raise this issue in the courts below, the defendants have forfeited plenary appellate review and are now limited to seeking relief via plain error review. The defendants counter that Blakely, decided on June 24, 2004, announced a new rule and that they mounted their constitutional challenge as soon as possible after Blakely was decided.[13] The defendants maintain that penalizing them for failing to raise the constitutional issue sooner would be inappropriate in light of this Court's

---

[11] Neither defendant contends that the imposition of consecutive sentences violated their right to a jury trial.

[12] Gomez raised the issue by filing a supplement to his application for permission to appeal. Londono has included a discussion of this issue in his initial brief.

[13] This Court has endeavored to resolve expeditiously the important issues presented in this appeal. As stated above, Blakely was issued on June 24, 2004. On August 2, 2004, the United States Supreme Court granted certiorari in United States v. Booker, 04-104 and United States v. Fanfan, 04-105. On September 2, 2004, Gomez filed a motion to supplement authorities, relying upon Blakely. On October 4, 2004, the United States Supreme Court heard argument in Booker and Fanfan. Also on October 4, 2004, this Court granted the defendants' applications for permission to appeal and expedited these Nashville cases for hearing in Knoxville during the January 2005 court session. This Court heard oral argument on January 4, 2005, and the United States Supreme Court issued its decision in Booker and Fanfan on January 12, 2005. Gomez, Londono, and the State were then given until February 14, 2005 to file supplemental briefs addressing Booker, and until February 24, 2005 to file replies to these supplemental briefs.

decision in Graham v. State, 90 S.W.3d 687 (Tenn. 2002). In Graham, we rejected a constitutional challenge similar to the one now under consideration, holding that the Sixth Amendment does not preclude trial judges from finding enhancement factors by a preponderance of the evidence and from considering such factors when selecting the appropriate sentence within a statutory range. Id. at 692. The defendants contend that because Graham had rejected such a constitutional challenge, their failure to raise earlier and preserve properly the constitutional challenge they now bring is excusable. However, we find each of the defendants' arguments unpersuasive and conclude that plain error review applies to their Sixth Amendment challenge.

First, we are of the opinion that Blakely did not announce a new rule. Admittedly, the United States Supreme Court has not squarely addressed this issue. However, the Court has suggested that Blakely was applying a previously recognized principle of law, rather than announcing a new rule. For example, in United States v. Booker, 125 S. Ct. 738 (2005), the Court at the outset refers to "our Apprendi line of cases," making it clear that Apprendi, not Blakely, established the operative rule of law. Booker, 125 S. Ct. at 747. Furthermore, the Court in Booker expressly confirmed that the result which the majority reached in Blakely had been dictated by precedent, stating, "[f]or reasons explained in Jones v. [United States, 526 U.S. 227 (1999)], Apprendi, and Ring v. [Arizona, 536 U.S. 584 (2002)], the requirements of the Sixth Amendment were clear. The application of Washington's sentencing scheme violated the defendant's right to have the jury find the existence of 'any particular fact' that the law makes essential to his punishment." Booker, 125 S. Ct. at 749 (quoting Blakely, 124 S. Ct. at 2536). The Court in Booker concluded:

> Accordingly, we reaffirm our holding in Apprendi: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.

Booker, 125 S. Ct. at 756. Thus, the language of Booker demonstrates that the United States Supreme Court does not regard Blakely as having announced a new rule of law.[14] See also Apprendi, 530 U.S. at 490 (describing its holding as "foreshadowed by" Jones v. United States, 526 U.S. 227 (1999)); Blakely, 124 S. Ct. at 2536 (applying "the rule [we] expressed in Apprendi").

Although some other courts and jurists have concluded that Blakely announced a new rule, the United States Supreme Court is the final arbiter of this issue. Cf. Beard v. Banks, __ U.S. __, 124 S. Ct. 2504 (2004) (reversing the federal circuit court of appeals and holding that Mills v. Maryland, 486 U.S. 367 (1988) announced a new rule). In our view, United States Supreme Court decisions

---

[14]The dissent asserts that Blakely must have announced a new rule because "Booker, which was merely an application of Blakely, stated a new rule. . . ." In our view, the new rule of Booker was the Court's holding that the Federal Sentencing Guidelines violated the Sixth Amendment, the Court's excision of the mandatory portions of the Guidelines, and the Court's application of the excised Guidelines. See Humphress v. United States, 398 F.3d 855, 861 (6th Cir. 2005). The Sixth Amendment principle necessitating the Court's holding was not new and was the same principle discussed in Jones v. United States, 526 U.S. 227 (1999) and clearly "expressed in Apprendi." Blakely, 124 S. Ct. at 2536.

provide authoritative insight on how this question ultimately will be answered. Having carefully considered these authorities, we conclude that Blakely did not announce a new rule.

Nonetheless, even had Blakely announced a new rule of law, our conclusion that the defendants are not entitled to plenary appellate review of this issue would have been the same. As previously explained, Griffith mandates plenary review in direct review, "pipeline" cases only if the issue to which the new rule relates has been preserved for review. 479 U.S. at 328. Neither Gomez nor Londono preserved a Sixth Amendment challenge to the imposition of their sentences. This constitutional challenge was raised for the first time in this Court after Blakely was decided. Thus, the defendants are limited to seeking relief on their Sixth Amendment claim via plain error review. See Booker, 125 S. Ct. at 769 ("[W]e expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test."); Cotton, 535 U.S. at 627 (applying plain error review to an alleged Apprendi error that had not been raised in the district court).

Although the defendants are correct in pointing out that we rejected a similar constitutional challenge in Graham, this fact does not excuse the defendants' failure to raise their Sixth Amendment claim. To the contrary, Graham illustrates that Tennessee defendants could have asserted Blakely-type challenges long before the United States Supreme Court decided Blakely. To the extent that the defendants are suggesting that Graham deterred them from raising their Sixth Amendment claim, they are factually mistaken because Graham was released seven months *after* the defendants were sentenced and six months *after* the trial court denied the defendants' motions requesting a new trial.

Furthermore, had Graham been released before the defendants were sentenced, our conclusion would be the same. At the risk of stating the obvious, this Court is not the final arbiter of the United States Constitution. See, e.g., Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000) (noting that this Court is the final arbiter of the Tennessee Constitution, not the United States Constitution). Like all Tennessee courts, this Court is bound by the United States Supreme Court's interpretation of the United States Constitution.[15] Defendants dissatisfied with this Court's interpretation of the United States Constitution can and often do seek review in the United States Supreme Court. See, e.g., Rogers v. Tennessee, 532 U.S. 451 (2001); Payne v. Tennessee, 501 U.S. 808 (1991). Because such review is available, criminal defendants routinely raise and preserve for federal review issues this Court has previously rejected. See, e.g., State v. Dellinger, 79 S.W.3d 458, 472 (Tenn. 2002) ("We have repeatedly rejected this argument in prior cases and decline to revisit the issue here."); Harris v. State, 947 S.W.2d 156, 176 (Tenn. Crim. App. 1996) ("The appellant raises numerous constitutional challenges to Tennessee's death penalty statute . . . in order to preserve the issues for later review by the federal appellate courts.")

_____

[15]See, e.g., State v. Carruthers, 35 S.W.3d 516, 561 (Tenn. 2000); Strouth v. State, 999 S.W.2d 759, 765 n.9 (Tenn. 1999); State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984).

Moreover, nothing in our decision in Graham precluded the defendants from raising Blakely-type challenges in future cases. Admittedly, Graham's existence meant that such claims would likely have been unsuccessful, but the defendants could have raised and preserved such issues for review by this Court and by the United States Supreme Court. Indeed, a defendant is never precluded from raising an issue simply because a prior decision has rejected it. As our previous discussion of Griffith makes clear, courts often reconsider arguments that have been previously rejected. See also Engle v. Isaac, 456 U.S. 107, 130 (1982) ("Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid."). Ring v. Arizona, 536 U.S. 584 (2002) well illustrates this point. In Ring, the Court overruled Walton v. Arizona, 497 U.S. 639 (1990), "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." Ring, 536 U.S. at 609. The defendant in Ring preserved his argument under Apprendi even though that very argument appeared to be foreclosed by Walton. Adverse precedent neither bars a defendant from raising and preserving an issue for review nor excuses a defendant's failure to do so. Thus, because the defendants failed to raise and to preserve for review their Sixth Amendment challenge, the defendants are limited to seeking relief via plain error review.[16]

---

[16]Limiting the defendants to seeking relief via plain error review, rather than affording them plenary appellate review, is not at all dependent upon our view that Blakely did not announce a new rule. Defendants ordinarily are not entitled to plenary appellate review unless claims have been timely raised and properly preserved. Likewise, a defendant is not entitled to plenary appellate review of a claim based upon a new rule unless the defendant has timely raised and properly preserved the issue to which the new rule relates. The dissent's quarrel with our application of this rule to the defendants' Blakely claim is curious, given the dissenting justices' concurrence with our application of this rule to Gomez's Crawford claim. On the one hand, the dissenting justices conclude that plenary appellate review applies to the defendants' unpreserved Sixth Amendment claims because Blakely announced a new rule; on the other hand, the dissenting justices conclude that plain error review applies to Gomez's unpreserved Confrontation Clause claim, which is based upon the new rule announced in Crawford. The dissenting justices thus express fundamentally inconsistent conclusions as to the review which courts should apply to unpreserved claims which are based upon new rules.

Furthermore, as a practical matter, defendants raising Blakely claims are not entitled to relief, regardless of whether plenary or plain error review is applied. As hereinafter explained, the Tennessee Criminal Sentencing Reform Act does not authorize a sentencing procedure which violates the Sixth Amendment right to jury trial. We recognize that some defendants will choose to raise and to pursue Sixth Amendment Blakely-type claims in the hope that the United States Supreme Court will ultimately disagree with our determination of this issue, and nothing in this decision precludes them from doing so.

Finally, we are constrained to point out that, in addition to being irrelevant in this direct review appeal, the dissent's suggestion that a petitioner will be able to rely upon Blakely as a ground for reopening a post-conviction petition under Tennessee Code Annotated section 40-30-117(a)(1), is erroneous. Reopening is appropriate under section -117(a)(1), "[i]f the claim is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required." As to whether "retrospective application . . . is required," Tennessee Code Annotated section 40-30-122 provides that

[a] new rule of constitutional criminal law shall not be applied retroactively in a post-conviction proceeding unless the new rule places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe or requires the observance of fairness safeguards that are implicit in the concept of ordered liberty.

(continued...)

-17-

### B. Plain Error Review - The Record on Appeal

As previously explained, this Court will reverse for plain error only if

(a) the record . . . clearly establish[es] what occurred in the trial court;

(b) a clear and unequivocal rule of law [has] been breached;

(c) a substantial right of the accused [has] been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42). An appellate court need not consider all five factors if consideration of any one factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

In this case, factor (a) is satisfied. The record clearly establishes what occurred in the trial court. Gomez and Londono were convicted of: (1) conspiracy to commit aggravated robbery, a Class C felony which carries a three to six year sentence; (2) facilitation of felony murder, a Class A felony, which carries a fifteen to twenty-five year sentence; (3) facilitation of especially aggravated robbery, a Class B felony, which carries an eight to twelve year sentence; and (4) facilitation of aggravated robbery, a Class C felony, which carries a three to six year sentence. The trial court found and applied two enhancement factors as to all four convictions: "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;" and "[t]he defendant was a leader in the commission of the offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2), (3) (2003). As to the defendants' conviction for facilitation of felony murder, the trial court applied an additional enhancement factor—"[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense." Id. at (10). As to each defendant and all convictions, the trial judge imposed the maximum sentence within the range: (1) six years for conspiracy to commit aggravated robbery; (2) twenty-five years for facilitation of felony murder; (3) twelve years for facilitation of especially aggravated robbery; and (4) six years for facilitation of aggravated robbery. The trial court stated that, in selecting the maximum sentence as the appropriate

---

[16](...continued)

This standard would not permit, much less require, Blakely's retroactive application in a post-conviction proceeding. Indeed, applying a standard virtually identical to section -122, the United States Supreme Court has already concluded that the new rule announced in Ring requiring jury findings of aggravating circumstances in capital cases does not qualify for retroactive application to sentences that were final before Ring was decided. See Schriro v. Summerlin, __ U.S. __, 124 S. Ct. 2519 (2004) (concluding that Ring announced a new rule by overruling Walton, but, applying a standard virtually identical to section -122, refusing to apply Ring retroactively to cases already final ). Given the Court's holding in Schriro, there is no reason to believe that Blakely would be afforded retroactive application to final convictions should the United States Supreme Court ultimately conclude that Blakely announced a new rule. See United States v. Price, 400 F.3d 844, 849 (10th Cir. 2005) (concluding that Blakely announced a new rule but that the new rule does not apply retroactively); cf. Humphress, 398 F.3d at 862-63 (concluding that the new rule announced in Booker does not apply retroactively to convictions already final); Varela v. United States, 400 F.3d 864 (11th Cir. 2005) (same). Thus, seeking reopening under section -117 based on Blakely would be a futile endeavor. Conspicuously absent from the dissenting opinion is any authority supporting the dissent's assertion that this Court may retroactively apply a federal constitutional rule which the United States Supreme Court has refused to apply retroactively.

-18-

sentence, it had afforded "great weight" to the first factor, the defendants' previous history of criminal convictions. At the time of the sentencing hearing, Gomez had been convicted of "Theft from Interstate Shipment, April 14, 1999, United States District Court, Northern District of Texas, Fort Worth Division," and Londono had been convicted of "Manslaughter, April 12, 2000, Houston, Texas Criminal Court."

## C. Plain Error Review - Violation of a Clear and Unequivocal Rule of Law

Having determined that the record clearly establishes what occurred in the trial court, we must next determine whether the defendants' sentences were imposed in violation of a "clear and unequivocal rule of law." As previously explained, plain error review extends only to clear, conspicuous, or obvious error. Olano, 507 U.S. at 732.[17] Whether an error is "plain" or "obvious" is determined by reference to the law existing as of the time of appellate consideration. Johnson, 520 U.S. at 468.

Although this Court has not previously addressed the constitutional claim raised by the defendants, in many decisions addressing this issue, the Court of Criminal Appeals has concluded that Tennessee's sentencing procedures violate the Sixth Amendment right to jury trial as explained in Blakely. In this appeal the State agrees with the defendants that the presumptive sentence established by Tennessee Code Annotated section 40-35-210(c) (2003) is the maximum sentence

---

[17]The dissent faults us for creating what the dissent terms "a new course" by which "all decisions are now retroactive, whether they constitute a new constitutional rule or not. The only question is whether or not the defendant properly preserved the issue, entitling him to plenary review, or whether the defendant failed to preserve the issue, entitling him only to plain error review." This course is not new. As explained in section II. B of this opinion, as to direct review cases, the only relevant question since Griffith is whether the defendant is entitled to plenary appellate review or plain error review. New rules apply to cases pending on direct review when the new rule is announced. However, like other unpreserved claims of error, when a defendant fails to raise and to preserve the claim to which the new rule relates, the defendant is limited to seeking relief via plain error review. Johnson v. United States, supra, is an excellent illustration of this principle. Johnson involved a federal perjury prosecution in which the element of materiality had been decided by the judge rather than submitted to the jury. The defendant failed to object to this procedure at trial because "near-uniform precedent both from this Court [the United States Supreme Court] and the Court of Appeals" had held that the element of materiality could be decided by the judge. Johnson, 520 U.S. at 468. After Johnson had been convicted, but before her appeal became final, the United States Supreme Court decided United States v. Gaudin, 515 U.S. 506 (1995), which held that materiality of a statement must be submitted to the jury rather than decided by the trial judge. Johnson argued on appeal that the failure to submit materiality to the jury rendered her conviction invalid under Gaudin. The Eleventh Circuit Court of Appeals reviewed Johnson's unpreserved claim for plain error and denied relief. The United States Supreme Court affirmed. In doing so, the Court first acknowledged that Gaudin had announced a new rule and that under Griffith the new rule applied to Johnson's direct review case. Johnson, 520 U.S. at 467. Nevertheless, the Court reviewed Johnson's unpreserved claim for plain error and denied relief. In applying plain error review, the Court explained that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal – it is enough that an error be "plain" at the time of appellate consideration." Johnson, 520 U.S. at 468. Thus, Johnson supports our conclusion that the relevant question is whether a defendant has preserved a claim of error, regardless of whether the claim is based upon a new rule or upon authority existing at the time of trial. Simply put, plain error review applies to all unpreserved claims of error, regardless of whether such claims are based upon new rules. That the dissent fails to grasp these aspects of plain error review is troubling, particularly in light of the fact that the dissenting justices concurred in section II. B of this opinion, which includes a detailed discussion of plain error review and the analysis which it entails.

-19-

which a judge can constitutionally impose because, in the State's view, the presumptive sentence is the only sentence authorized by the jury verdict. Moreover, because the trial judge in this case found enhancement factors (other than the fact of the defendants' prior convictions) and selected a sentence other than the presumptive sentence, the State concedes that the defendants' sentences were imposed in violation of the Sixth Amendment right to a jury trial. According to the State, the validity and correctness of its concession is supported by the United States Supreme Court's decision in Booker.

Before accepting a concession, this Court independently analyzes the underlying legal issue to determine whether the concession reflects a correct interpretation of the law. See, e.g., State v. Ely, 48 S.W.3d 710, 716 n.3 (Tenn. 2001); State v. Ducker, 27 S.W.3d 889, 893 n.1 (Tenn. 2000); State v. Shepherd, 902 S.W.2d 895, 906 (Tenn. 1995). Where, as here, a concession casts constitutional doubt upon a duly enacted statute, such an independent analysis is crucial. In conducting this analysis, we are mindful that statutes are presumed to be constitutional. See Gallaher v. Elam, 104 S.W.3d 455, 459 (Tenn. 2003); State v. Robinson, 29 S.W.3d 476, 479 (Tenn. 2000); Riggs v. Burson, 941 S.W.2d 44, 51 (Tenn. 1997). Indeed, we must "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." State v. Taylor, 70 S.W.3d 717, 721 (Tenn. 2002); see also Riggs, 941 S.W.2d at 51; In re Burson, 909 S.W.2d 768, 775 (Tenn. 1995).

Thus, we must conduct an independent analysis to determine whether the sentencing procedure violated a "clear and unequivocal rule of law." We begin this analysis with Apprendi, in which the defendant was convicted of second-degree unlawful possession of a firearm, an offense carrying a maximum penalty of ten years imprisonment. 530 U.S. at 469-70. On the prosecutor's motion, the sentencing judge found by a preponderance of the evidence that the crime had been committed "'with a purpose to intimidate . . . because of race, color, gender, handicap, religion, sexual orientation or ethnicity.'" Id. at 469 (quoting N.J. Stat. Ann. § 2C:44-3(e) (West Supp. 1999-2000)). This judicial finding had the effect of doubling from ten years to twenty years the maximum sentence to which Apprendi was exposed. Id. at 469. The judge sentenced Apprendi to twelve years in prison, two years more than the maximum that would have applied but for the judicial finding of racial motivation. Id. at 471-72. The Court held that imposition of this departure sentence violated Apprendi's Sixth Amendment right to a jury trial, stating: "[o]ther than the fact of prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Id. at 490.

In Blakely, the Court applied and expounded upon Apprendi. At issue in Blakely was the State of Washington's "determinate sentencing scheme."[18] Blakely had been charged with first-

---

[18]Booker, 125 S. Ct. at 749. "Determinate sentencing" has been widely understood to refer to a sentencing scheme that lacks a discretionary release mechanism, such as parole. "Determinancy" describes the extent to which a judge's sentence determines the length of time a defendant will actually serve in prison. "Indeterminate sentencing" has been widely understood to refer to a system in which a releasing authority, such as a parole board, has discretion to release a defendant prior to expiration of the full sentence imposed. However, the Court in Booker and Blakely used the term "determinate sentencing" to refer to sentencing systems in which a judge's discretion is constrained by an internal sentencing threshold. The Court used the term "indeterminate sentencing" to refer to systems with no such

(continued...)

degree kidnapping, but he pleaded guilty to second-degree kidnapping with a firearm, a class B felony punishable by a term of not more than ten years. Other statutory provisions mandated a "standard" sentence of forty-nine to fifty-three months, unless the judge found aggravating facts justifying an exceptional sentence. Blakely, 124 S. Ct. at 2537. Although the prosecutor recommended a sentence in the standard range, the judge found that Blakely had acted with "deliberate cruelty" and sentenced him to ninety months, a sentence approximately three years longer than the fifty-three month maximum sentence available in the standard range. Blakely appealed, arguing that this sentencing procedure deprived him of his Sixth Amendment right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence. Id. at 2534-35.

In concluding that Washington's sentencing procedure violated Blakely's Sixth Amendment right to a jury trial, the Court emphasized that the "deliberate cruelty" finding had been based upon facts that were neither admitted by Blakely nor found by a jury beyond a reasonable doubt. The Court pointed out that the guilty plea authorized the Washington trial judge to impose a sentence within the standard range of forty-nine to fifty-three months. Absent the finding of "deliberate cruelty," the trial judge could not have imposed the exceptional ninety month sentence. Id. at 2537. The Court rejected the State's argument that the jury verdict was sufficient to authorize a sentence anywhere within the ten-year statutory range for Class B felonies, explaining:

> Our precedents make clear, however, that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

Id. (citations omitted). Accompanying this explanation of "statutory maximum" was a discussion of the nature and limits of the Sixth Amendment:

> First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the

[18](...continued)
internal constraints, where judges are free to sentence anywhere within the statutory limits. Jon Wool, Beyond *Blakely*: Implications of the *Booker* Decision for State Sentencing Systems, at 3, Policy and Practice Review (Vera Inst. of Justice February 2005), *at* http://www.vera.org/publications/publications_5.asp?publication_id=268 (last visited Mar. 1, 2005).

exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence–and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

Id. at 2540 (emphasis in original). Blakely thus drew a constitutionally significant distinction between judicial factfinding in a "determinate" sentencing scheme and judicial factfinding in an "indeterminate" sentencing scheme. See footnote 18, supra. The Court's holding in Booker focuses to an even greater degree upon this distinction.

In Booker, the Court addressed the question specifically left unanswered in Blakely—whether the Federal Sentencing Guidelines ("Guidelines") violate the Sixth Amendment right to jury trial. Booker was convicted of possession with intent to distribute at least fifty grams of cocaine base, an offense statutorily punishable by ten years to life in prison. Booker, 125 S. Ct. at 746. Based upon his criminal history and the quantity of drugs found by the jury, the Guidelines set Booker's maximum sentence at 262 months (twenty-one years and ten months). Id. At a sentencing hearing, the district judge concluded by a preponderance of the evidence that Booker had possessed an additional 566 grams of cocaine base and that Booker was guilty of obstructing justice. Under the Guidelines, these additional findings mandated a sentence between 360 months to life imprisonment, and the trial judge imposed a sentence of 360 months (thirty years). Id. The Seventh Circuit reversed, holding that application of the Guidelines to impose a sentence in excess of the maximum sentence authorized by the jury verdict alone conflicted with Apprendi.

In United States v. Fanfan, the case consolidated with Booker, the defendant was convicted of conspiracy to distribute and to possess with intent to distribute at least 500 grams of cocaine, offenses statutorily punishable by a sentence of five to forty years. Booker, 125 S. Ct. at 747. Based upon the jury's verdict, the Guidelines set Fanfan's maximum sentence at seventy-eight months. The district court conducted Fanfan's sentencing hearing shortly after the Court rendered its decision in Blakely. The district court found additional facts by a preponderance of the evidence that would have mandated a Guidelines sentence between 188 and 235 months. However, in light of Blakely the district court declined to impose the mandatory increase and instead imposed the seventy-eight month maximum sentence authorized by the jury's verdict. Id. at 747.

The United States Supreme Court agreed with the lower courts' conclusions that application of the Guidelines to impose upon Booker and Fanfan a sentence in excess of that authorized by the jury's verdict violated the Sixth Amendment right to a jury trial. In so holding, the Court observed that "there is no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures" at issue in Blakely. Booker, 125 S. Ct. at 749. This conclusion, the Court explained, *"rests on the premise, common to both systems, that the relevant sentencing*

-22-

*rules are mandatory and impose binding requirements on all sentencing judges."* Id. (emphasis added). Further explaining the mandatory versus non-mandatory distinction, the Court in Booker observed:

> If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, *their use would not implicate the Sixth Amendment.* We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. Indeed, *everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act] the provisions that make the Guidelines binding on district judges;* it is that circumstance that makes the Court's answer to the second question presented possible. *For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.*

Id. at 750 (emphasis added). Thus, Booker instructs us that the Sixth Amendment is not implicated by a sentencing procedure which uses non-binding, advisory enhancement factors to inform and to guide the judge's selection of an appropriate sentence in the statutory range authorized by the jury's verdict. The remedial majority opinion, authored by Justice Breyer, confirms that allowing a judge to find and to consider enhancement factors in a non-mandatory, discretionary sentencing system does not violate the Sixth Amendment. Indeed, the remedy applied in Booker *requires* district judges to do so in all future cases. Id. at 764 (excising the statute making the Guidelines binding on sentencing courts and the statute requiring de novo review of sentences on appeal, and stating that "[w]ith these two sections excised (and statutory cross-references to the two sections consequently invalidated), the remainder of the Act satisfies the Court's constitutional requirements."). Justice Breyer explained that the statutory provision which made the Guidelines mandatory and binding on district court judges "is a necessary condition of the constitutional violation. That is to say without this provision . . . the statute falls outside the scope of Apprendi's requirement." Id. at 764. Thus, in Booker all nine justices agreed that the Sixth Amendment is not implicated by a sentencing statute which permits judge fact-finding, but which does not mandate imposition of an increased sentence upon the judge's finding of a fact. Id. at 749-50, 764.

Admittedly, Blakely itself includes language which can be broadly construed to require the result the defendants seek. We are unwilling to adopt that broad reading of Blakely. Blakely must be read in light of Booker. Not only has Booker provided further insight as to the constitutionally significant differences between "determinate" and "mandatory" sentencing schemes versus "indeterminate" and "non-mandatory" sentencing schemes, this Court has a duty to resolve doubts in favor of the constitutionality of statutes. In our view, Booker confirms that Tennessee's sentencing structure differs markedly and in constitutionally significant ways from the Guidelines and the New Jersey and Washington statutes at issue in Apprendi and Blakely.

The Tennessee Criminal Sentencing Reform Act of 1989 ("Reform Act") (1) divides felonies into five classifications according to the seriousness of the offenses; (2) separates offenders into five classifications according to the number of prior convictions; (3) assigns a span or range of years for each class of crime committed by each class of offenders; and (4) employs enhancement and mitigating factors to assess the definite sentence within each range. Tenn. Code Ann. §§ 40-35-105–114 (2003); State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). Under the Reform Act, trial courts *must consider* the following in assessing a sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing[19] and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the enhancement and mitigating factors . . .; and
(6) Any statement the defendant wishes to make in his own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2003); Ashby, 823 S.W.2d at 168. The Reform Act classifies offenses according to their seriousness and offenders according to their prior convictions and thereby predetermines the nature and extent of punishment that should be imposed for similar offenses committed by similar offenders. Jones, 883 S.W.2d at 600. The Reform Act affords judges discretion to select an appropriate sentence within a predetermined statutory range, but judges in Tennessee have no authority to impose a sentence outside the statutory range. In exercising their discretion to select an appropriate sentence within the range, the Reform Act, much like the remedy adopted in Booker, requires that judges find and consider statutory enhancement factors and

---

[19] As to sentencing principles, the statute provides:
(1) Sentences involving confinement should be based on the following considerations:
    (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
    (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
    (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;
(2) The sentence imposed should be no greater than that deserved for the offense committed;
(3) Inequalities in sentences that are unrelated to a purpose of this chapter should be avoided;
(4) The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed;
(5) The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed....
(6) Trial judges are encouraged to use alternatives to incarceration that include requirements of reparation, victim compensation and/or community service.
Tenn. Code Ann. § 40-35-103 (2003). Finally, the Act directs that an appropriate sentence is one which is "justly deserved in relation to the seriousness of the offense," is "fair and consistent [with other similar cases]," and "prevent[s] crime and promote[s] respect for the law." Tenn. Code Ann. § 40-35-102 (2003); State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).

mitigating factors. Judges may consider all enhancement factors that are "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114 (2003). Significantly, no provision in the Reform Act mandates an increase in a defendant's sentence upon the finding of an enhancement factor.

Unlike the statutes at issue in <u>Blakely</u> and <u>Booker</u>, a judicial finding of an enhancement factor in Tennessee does not affect the range of punishment to which a defendant is exposed. Tennessee Code Annotated section 40-35-210(c) through (e) provides:

> (c) The presumptive sentence for a Class B, C, D and E felony shall be the minimum sentence in the range if there are no enhancement or mitigating factors. The presumptive sentence for a Class A felony shall be the midpoint of the range if there are no enhancement or mitigating factors.
> (d) Should there be enhancement but no mitigating factors for a Class B, C, D or E felony, then the court may set the sentence above the minimum in that range but still within the range. Should there be enhancement but no mitigating factors for a Class A felony, then the court shall set the sentence at or above the midpoint of the range. Should there be mitigating but no enhancement factors for a Class A felony, then the court shall set the sentence at or below the midpoint of the range.
> (e) Should there be enhancement and mitigating factors for a Class B, C, D or E felony, the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, then reduce the sentence within the range as appropriate for the mitigating factors. Should there be enhancement and mitigating factors for a Class A felony, the court must start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors.

Thus, even after an enhancement factor is found, this statute affords to the judge discretion to choose an appropriate sentence anywhere within the statutory range, including the presumptive minimum sentence within the range. For Class B, C, D or E felonies, section -210(d) provides specifically that, if there are enhancement but no mitigating factors, the trial judge "*may* set the sentence above the minimum in that range but still within the range." Tenn. Code Ann. § 40-35-210(d) (2003) (emphasis added). For Class A felonies, section -210(d) provides that if there are enhancement but no mitigating factors, the trial judge "shall set the sentence *at or above* the midpoint of the range." <u>Id.</u> (emphasis added). Although the statute employs mandatory language ("must"), this language is qualified by the phrase "at or above the midpoint of the range" and by section -210 (c), which sets the presumptive minimum for Class A felonies at the midpoint of the range, and which does not mandate enhancement above the midpoint.

Section -210(e), similarly prescribes use of an advisory, discretionary procedure when a judge finds both enhancement and mitigating factors. The statute provides that the judge "must start at the minimum sentence in the range, enhance the sentence within the range *as appropriate* for the

enhancement factors, then reduce the sentence within the range *as appropriate* for the mitigating factors." (Emphasis added.) Although this section includes mandatory language, ("must" and "shall"), read in context this mandatory language loses its mandatory effect because this section directs the judge to enhance and to mitigate the sentence "as appropriate," thereby affording to the judge discretion to select an appropriate sentence anywhere within the range.

Thus, the finding of an enhancement factor simply does not mandate an increased sentence. Instead, the Reform Act thus provides what <u>Blakely</u> and <u>Booker</u> describe as an "indeterminate," non-mandatory, advisory sentencing scheme which merely requires judges to consider enhancement factors, along with other information, when exercising their discretion to select an appropriate sentence within the statutory range. Unlike the Washington sentencing statutes and the Guidelines, the Reform Act requires the trial judge to consider enhancement and mitigating factors to aid the trial judge in exercising discretion and choosing a sentence within the statutory range, but the Reform Act does not *mandate* an increased sentence upon a judge's finding of an enhancement factor. Rather, upon finding an enhancement factor under the Reform Act, a judge has the discretion to select a sentence *at or above* the presumptive minimum. Imposition of a sentence above the presumptive sentence represents an exercise of the judge's discretion.

The dissent, the defendant, and the State point out that when no enhancement or mitigating factors are found, section 40-35-210(c) mandates imposition of the presumptive sentence. Although we do not disagree with this proposition, we also do not view it as dispositive of the constitutional issue. Unlike the "standard range" statute in <u>Blakely</u>, section -210(c) does not lower the ceiling for felony sentences, nor is it like the statute in <u>Apprendi</u> which exposed the defendant to a punishment greater than that otherwise legally prescribed. Section -210(c) operates solely to limit the sentencing court's discretion in selecting a penalty within the available range by mandating imposition of the presumptive sentence when there "are no enhancement or mitigating factors." Tenn. Code Ann. § 40-35-210(c) (2003). The dissent contends that section -210(c) "fixes a <u>determinate</u> point, not a range and the trial judge has no discretion to deviate from this determinate point unless he or she makes additional findings that enhancement factors are present." The dissent's observation about how the statute functions is accurate. However, the dissent misinterprets the constitutional relevance of this observation.

The United States Supreme Court explained in <u>Booker</u> that "when a trial judge exercises his [or her] discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." 125 S. Ct. at 750; <u>see also</u> <u>Harris v. United States</u>, 536 U.S. 545, 558 (2002) ("Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.") Indeed, all nine justices agreed in <u>Booker</u> that the relevant constitutional inquiry is not whether a judge exercises sentencing discretion by finding facts, but rather whether the judge's finding of a fact mandates an increased sentence. 125 S. Ct. at 749-50, 764. Thus, to determine whether the defendants' sentences were imposed in violation of the Sixth Amendment, the relevant inquiry is not whether the Reform Act permits judicial fact-finding. Nor is the relevant inquiry whether the Reform Act sets a determinate point at which judges

-26-

must begin the exercise of their discretion and provides a determinate sentence which must be imposed *in the absence of enhancement and mitigating factors*. Rather, the relevant inquiry is whether the Reform Act mandates imposition of a sentence *increased* above the presumptive sentence *when a judge finds an enhancement factor*. Although the dissent is correct that the Reform Act requires trial judges to determine whether enhancement factors exist, the dissent fails to recognize that the finding of an enhancement factor does not mandate an increased sentence. Booker explains that the mandatory increase of a sentence is the crucial issue which courts must consider in determining whether a particular sentencing scheme violates the Sixth Amendment.

Considering this point, we conclude that the defendants' sentences were not imposed in violation of the Sixth Amendment. The Reform Act authorizes a discretionary, non-mandatory sentencing procedure and requires trial judges to consider the principles of sentencing and to engage in a qualitative analysis of enhancement and mitigating factors. The Reform Act does not include a formula, a grid, or any other mechanical process. It instead sets out broad sentencing principles, enhancement and mitigating factors, and a presumptive sentence, all of which serve to guide trial judges in exercising their discretion to select an appropriate sentence within the range set by the Legislature. Under the Reform Act, the finding of an enhancement factor does not mandate an increased sentence. The Reform Act does not provide a system which requires or even allows judicial power to "infringe[] upon the province of the jury." Blakely, 124 S. Ct. at 2540. Thus, for these reasons, and in accordance with our duty to indulge every presumption in favor of the constitutionality of statutes–a duty which the dissent fails to discuss–we conclude that Tennessee's sentencing structure does not violate the Sixth Amendment.[20]

For these reasons, we are unable to accept the State's concession that the defendants' sentences were imposed in violation of the Sixth Amendment. In light of our holding that the defendants' sentences were not imposed in violation of the Sixth Amendment, the defendants are not entitled to relief because the record reflects no plain error. The trial court carefully considered the enhancement and mitigating factors and exercised judicial discretion consistent with the statute. The evidence does not preponderate against the trial court's decision imposing the maximum sentence or the trial court's decision ordering consecutive service of the sentences.

### IV. **Conclusion**

Because the defendants failed to properly preserve their constitutional claims of error, we have reviewed these claims for plain error and have determined that the defendants are not entitled

---

[20] In response to the United States Supreme Court's decision in Blakely, Governor Bredesen appointed a "Task Force on the Use of Enhancement Factors in Criminal Sentencing." After many meetings, this Task Force recently issued a Report which includes recommendations for statutory amendments. This decision should not be construed as a comment upon the work or recommendations of the Task Force. Rather, this decision is limited to the issues presented by the case on appeal, and in resolving these issues this Court must afford to the sentencing statutes a presumption of constitutionality. Determining whether the recommendations of the Task Force should be adopted in whole or in part is a matter for the Governor and the General Assembly.

to relief.  Accordingly, the defendants' convictions and sentences are affirmed.  It appearing that the defendants are indigent, costs of this appeal are taxed to the State of Tennessee.

_____
FRANK F. DROWOTA, III,
CHIEF JUSTICE